IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCH OF:

PREMISES LOCATED AT
HOFFMAN ENTERPRISES
1225 S. MAIN STREET
SUITE 103
GREENSBURG, PA 15601

Magistrate No. 22-35

**[UNDER SEAL]**

## AFFIDAVIT IN SUPPORT OF

## AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, Andrew L. Bovaird, being first duly sworn, hereby state as follows:

## INTRODUCTION

1.      I make this Affidavit in support of an application for a search warrant for the

Greensburg, Pennsylvania business office of HOFFMAN VENTURES: 1225 S. Main Street; Suite

103; Greensburg, PA 15601 ("SEARCH LOCATION" herein). A detailed description of the

search location is listed in "Attachment A" and is incorporated herewith.

## AGENT BACKGROUND

2.      I am a Special Agent with the United States Department of Health and Human

Services, Office of Inspector General, and have been so assigned since March 2021. Prior to my

current role, I was employed as a Special Agent by the Pennsylvania Office of Attorney General,

Bureau of Criminal Investigations, Medicaid Fraud Control Section, from May 2014 to March

2021. In that capacity, I was detailed to the Federal Bureau of Investigation as a Task Force Officer

from January 2016 to March 2021 as part of the Western Pennsylvania Health Care Fraud Task

Force, a joint state-federal task force that investigates health care fraud and drug diversion.

Preceding my employment with the Office of Attorney General, I was an Anti-Money Laundering

Analyst with the PNC Financial Services Group from June 2011 to April 2014 where I reviewed

financial accounts for suspicious activity related to fraud, money laundering and terrorist financing.

3.      Through my training and experience, I have become familiar with the methods and techniques associated with health care fraud, drug diversion, money laundering and other white-collar crimes. Through leading and participating in both state and federal criminal investigations, I have reviewed financial, medical, pharmacy, and legal records, conducted physical and electronic surveillance, managed confidential informants, interviewed witnesses, interrogated suspects, testified in open court and grand jury proceedings, overseen consensual monitoring and recording of both telephonic and non-telephonic communications, and have been involved in the application for, and execution of, numerous search and arrest warrants. I have attended several trainings related to fraud, drug diversion and money laundering. I have been a Certified Fraud Examiner since 2013.

4.      The information set forth in this Affidavit is derived from a criminal investigation that is being conducted by the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), Federal Bureau of Investigation ("FBI"), Drug Enforcement Administration ("DEA"), and the Pennsylvania Office of Attorney General ("PA-OAG"). This information was acquired from witness interviews, physical surveillance, law enforcement database queries, subpoenas, billing claims data, and the review of medical records, bank records and prescribing patterns. I have personally participated in the investigation of the matters referred to in this Affidavit. The statements contained within this Affidavit are based upon my personal knowledge of and participation in the investigation, review of documentary evidence, discussions with other law enforcement officers, and my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause for the requested warrant, it does not set forth every fact known by me or other agents throughout the course of this investigation.

**BACKGROUND AND**

**PROBABLE CAUSE TO BELIEVE CRIMES HAVE BEEN COMMITTED**

5.       Based upon my training and experience, and the facts as set forth in this Affidavit, I have probable cause to believe that CLEAR DAY TREATMENT CENTER ("CLEAR DAY"), Richard HOFFMAN ("HOFFMAN"), Stephen DEVLIN ("DEVLIN") George JONES ("JONES"), Jon NJAGU ("NJAGU") (also known as "Johnny Brooklyn"), and potentially others, have committed violations of 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1035 (False Statements in Health Care Matters), 42 U.S.C. §§ 1320a-7b(b)(1)(A) and (B) (Anti-Kickback Statute), and 21 U.S.C. § 841 (Unlawful Dispensing of Controlled Substances). There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**Employee Interviews**

6.       In June 2020, the FBI received a complaint from a former employee indicating that CLEAR DAY was engaged in a practice whereby they admitted patients for detox and substance abuse treatment who did not appear to need treatment.  The complainant indicated that CLEAR DAY admitted patients for treatment even though their urine drug screens came back "clean" meaning that they lacked the presence of illicit drugs.  Additionally, these patients were brought to CLEAR DAY by NJAGU, the manager of local three-quarter homes[1] operating as SKYLINE RECOVERY. The complainant believed that NJAGU had received payments from CLEAR DAY for these medically unnecessary patient referrals.

7.       In July 2020, agents interviewed the complainant (Witness 1, "W-1" herein). W-1

---

[1] Three-quarter homes are transitional living centers where individuals may reside as they progress through recovery. They are generally less structured than halfway homes. Those homes associated with NJAGU are owned by Mazz & Lupi Enterprises, LLC (operating as "Skyline Recovery") and/or Recovery United Property Acquisition, LLC.

specified that NJAGU brought numerous individuals who resided in the three-quarter homes to CLEAR DAY. W-1 indicated that, in general, all CLEAR DAY patients submit to a point of care urine drug screen during the intake process. A point of care test, commonly known as a "dipstick" test, produces an instantaneous, preliminary result that reasonably allows the person reading the test to conclude whether an individual has recently used any illicit substances. Patients brought by NJAGU commonly had clean urine drug screens and these individuals stated that they were not using illicit drugs; however, NJAGU told them that, in order to receive "mental health treatment," they would have to be on some type of controlled substance. W-1 recalled NJAGU frequently brought patients to CLEAR DAY near the beginning of the month after they had already paid him rent at the recovery homes.

8.      W-1 further indicated that typical inpatient treatment at CLEAR DAY is 28 days. Patients brought in by NJAGU, however, often stayed less than the recommended time, leaving after only a few days. W-1 described it as if the patients "came to" and realized that they had been coerced by NJAGU into going to CLEAR DAY. Most of CLEAR DAY's patients utilized government-funded insurance, namely Medicaid, while a few patients utilized private insurance plans to cover the cost of their stay. W-1 stated that Tammy GRAFT performed CLEAR DAY's insurance billing remotely.

9.      W-1 understood NJAGU to be an independent contractor. W-1 recalled paying NJAGU out of a petty cash fund on multiple occasions at the direction of DEVLIN. W-1 was also aware of NJAGU receiving checks from CLEAR DAY to cover expenses related to him bringing patients to the clinic, including having his vehicle detailed. CLEAR DAY advertises covering the transportation costs to their facility and has a registered list of vehicles with which they use to transport patients. At the time of W-1's interview, NJAGU's vehicle was not one of them.

10.     W-1 also indicated that an individual, described in this Affidavit as "KB", was HOFFMAN's secretary. KB allegedly attended board meetings with HOFFMAN and kept copies of minutes in her office. W-1 spoke with KB on occasion, and, through their discussions, W-1 became uncomfortable with what sounded like unethical behavior that was discussed during the board meetings. KB also made payments to NJAGU.

11.     W-1 indicated that the electronic medical records software ("EMR"), "SAMMS", was administered by a local company, IT Med Rx, which contracted with CLEAR DAY. IT Med Rx is in Greensburg, PA and is owned by Edward CAMPBELL and Destiny (Myers) CAMPBELL.

12.     In July 2020, agents interviewed Witness 2 ("W-2") who, at the time, was a former employee of CLEAR DAY. W-2 explained that CLEAR DAY offers both detoxification ("detox") and inpatient rehabilitation ("rehab") services. The difference between the two is that detox is for someone who is currently abusing certain substances and needs a period of physician-approved, medically monitored observation throughout the withdrawal period. This typically lasts about three to five days depending on the individual. Patients commonly transition to inpatient rehab thereafter for medication assisted treatment ("MAT"). The duration for MAT at CLEAR DAY is 28 days, though some residents have stayed up to 90 days because of waiting periods at halfway homes or other facilities. Some clients go directly to rehab if they were abusing drugs such as cocaine or methamphetamine as those substances of abuse do not require a detox period.

13.     W-2 explained that new clients met with counselors who developed a unique treatment plan for those individuals. W-2 documented face-to-face and telephonic interactions with patients in progress notes into SAMMS, which was created by Netrix, LLC. Generally, counselors are to adhere to the assessment standards of the American Society of Addiction

Medicine (ASAM).

14.    W-2 stated that patients brought by NJAGU typically did not stay for the authorized 28-day period. NJAGU, a non-medical professional, has advised his residents that they only had to stay at CLEAR DAY for a maximum of 14 days, instead. NJAGU had done that so frequently that it became a point of frustration amongst employees of CLEAR DAY, so much so that emails were circulated about it.

15.    W-2 further corroborated much of the information provided by W-1 and added additional details.  W-2 recalled a patient who NJAGU brought to CLEAR DAY and admitted with a clean urine drug screen.  NJAGU instructed the patient to sign a document indicating that it was her idea to go to CLEAR DAY.  When W-2 raised her concerns about this admission with CLEAR DAY management, they told her that the patient should remain at the facility anyway.

16.    W-2 recalled another patient who had been substance-free for four-and-a-half years with only one relapse during this period.  Despite this, NJAGU allegedly told her she would have to go to CLEAR DAY or else she could not return to NJAGU's three-quarter home in which she was residing.

17.    In January 2021, agents learned that W-2 was once again employed at CLEAR DAY. When interviewed again in February 2021, W-2 stated that NJAGU had recently been hired on as an employee of the clinic in an "outreach and transportation" role.

18.    Agents interviewed Witness 3 ("W-3") in November 2020 and again in February 2021. W-3 advised that he personally knew of three individuals who had been patients of CLEAR DAY and had very negative experiences with the clinic in terms of the quality of treatment received. W-3 obtained documents from the Pennsylvania Department of Health's ("PA-DOH") website which showed, during an inspection, the PA-DOH found instances of non-licensed staff

performing the work of licensed drug and alcohol counselors.

19.    In August 2021, agents interviewed Witness 4 ("W-4") who is a former counselor at CLEAR DAY. W-4 described the overall level of treatment at CLEAR DAY, and its reputation in the treatment community, as poor. The nursing staff was "awful" in that they openly spoke poorly of patients in common areas, left sensitive health information out in the open, and made medication errors which were often "brushed under the table." Moreover, they indiscriminately discharged patients, without a physician's orders, for reasons that made no sense.

20.    W-4 felt concerns with patient admissions at CLEAR DAY. As a counselor, she received patients after they went through intake. Based upon her review of some of the patients' assessments, W-4 believed that the appropriate level of care was not met, i.e., admission into CLEAR DAY for treatment was not necessary.  In essence, W-4 suspected that intake staff was "bullshitting the forms to fill beds."

21.    W-4 had additional concerns regarding counseling at the clinic. Three different types of counseling therapy were offered at CLEAR DAY: Process Group Therapy, Psycho Ed/Lecture Group Therapy, and Individual Therapy. W-4 advised that Process Group Therapy could not have more than 12 individuals; however, CLEAR DAY exceeded this all the time. At the direction of one counselor, known in this Affidavit to be W-2, who was described by W-4 as Clinical Director George JONES's "right hand person", counselors manipulated the sign-in sheets to reflect that no more than 12 patients were present. W-4 provided the following example: W-2 told counselors to document they saw ten patients. Any patients in excess of that number were to be documented under the names of other counselors, some of whom may not have been working those days, in order to keep the numbers below the required threshold put in place by the Pennsylvania Department of Health, Department of Drug and Alcohol Programs ("DDAP").

22.    W-4 further explained that CLEAR DAY is paid per diem by Medicaid. Since they are audited by DDAP on a periodic basis, if evidence was found that more than 12 patients were being counseled at a time, DDAP would recoup all monies associated with those instances for the Commonwealth. W-4 saw more than 12 patients virtually every day in the approximate 12-month period she worked there. She took those concerns directly to JONES who told her to "fix it" which she interpreted to mean (continue to) "lie" on the forms. Counselor schedules were kept on a Microsoft Word document on W-2's computer.

23.    W-4 is aware of Jon NJAGU having a referral-based relationship between CLEAR DAY and recovery homes that he managed. The relationship became widely known around the clinic, so much so that, in the summer of 2020, there was some nervous chatter about it. NJAGU approached W-4 and asked her to help him draft a "declaration letter" to state he would no longer affiliate his sober homes with CLEAR DAY patients. NJAGU, who was initially a contractor with the clinic, responsible for transportation and answering phones, became an employee of CLEAR DAY shortly after that conversation.

24.    W-4 advised that desktop computers were in each counselor's office, one desktop computer at the nursing station and one desktop computer in the physicians' office. Additionally, there was a shared laptop for the counselors and a shared laptop for the nurses for medication management. The nurses may have also had a tablet related to medication management. CLEAR DAY most recently utilized ZENCHARTS as their EMR provider. ZENCHARTS is cloud-based and the clinic switched to it sometime around the end of 2020. Prior to that they utilized a different EMR software called SAMMS. The manipulation of records occurred in both systems. Each staff member had a unique username and password in both EMR systems.

25.    In November 2021, agents interviewed Witness 5 ("W-5"), a former nurse in

CLEAR DAY's detox unit. W-5 stated that she worked at the clinic for approximately five months and, in the time, became aware of an individual named "Johnny" who was a driver for CLEAR DAY and ran "halfway houses" from which he referred many of his residents to CLEAR DAY. "Johnny" bragged that he was friends with DEVLIN. "Johnny's" patients appeared to have worse relapse histories than other patients. W-5 witnessed "Johnny" sometimes bring up to three people at one time to the clinic for admission. Often this was done without any advance notice.

26.     W-5 advised that, for the approximate five-month duration of her employment at CLEAR DAY, which ended sometime in or shortly after January 2021, the clinic was largely paper-based in terms of its recordkeeping and patient files. While they did use an EMR system known as ZenCharts, the bulk of their patient records were paper. These were kept in the nurses' shared office. W-5 could not recall ever having to access any other, older EMR systems besides ZenCharts.

27.     W-5 stated that controlled and non-controlled medications were "stockpiled" at CLEAR DAY. This was done so that new patients who were newly admitted, or for patients whose prescriptions had been ordered by a physician after the daily pharmacy deliveries had already arrived. W-5 felt as though CLEAR DAY was very unorganized. Employee payroll was handled by ADP.

**Patient Interviews**

28.     Agents interviewed Witness 6 ("W-6") in February 2021 who stated that he had self-admitted to CLEAR DAY for alcohol detox and a minor opioid dependence from years of taking hydrocodone because of injuries. W-6 cannot recall his stay at the facility due to the amounts and types drugs that were prescribed to him by Dr. James LIM. W-6 described being given a "cocktail" of drugs that rendered him incoherent. Upon admittance, W-6 was allegedly not

given a Health Insurance Portability and Accountability Act (HIPAA) release form which prevented information regarding his treatment from being released to his family. W-6, who was kept in detox at CLEAR DAY for ten days, had fallen multiple times due to his mental and physical state, one of which was so severe that he was taken to a local emergency room. W-6 was discharged by CLEAR DAY on his tenth day because his insurance no longer authorized payment.

29.    W-6 provided agents with copies of some of the medical records from CLEAR DAY. Prescribed drugs included Buprenorphine, Clonidine and Librium. A "Factsheet" in W-6's intake paperwork, which appears to be a demographic record, lists a section in which referral types can be documented, one of which lists "Marketer." Based upon my training and experience, there are kickback schemes in the healthcare industry in which "marketers" recruit individuals from surrounding communities for treatment at clinics regardless of medical necessity and are, in turn, compensated by the clinic for the fraudulent referrals.

30.    Agents interviewed Witness 7 ("W-7") in March 2021. W-7 was a patient of CLEAR DAY who self-admitted to the facility for alcohol detox and crack cocaine dependence. Upon arrival, W-7 had a negative ("0.00") reading on two different breathalyzer tests that were given by the CLEAR DAY staff. W-7, who had a history of heavy alcohol abuse, was prescribed what he believed to be an excessive dose of Librium, a benzodiazepine Schedule IV controlled substance, over the course of the three days he spent at CLEAR DAY. W-7 told agents that he was assessed during intake for the appropriate medication-based treatment. According to W-7, out of a possible score of thirty-five, with that number indicating the greatest amount of Librium needed, he scored five. W-7 urinated himself multiple times after being administered Librium by CLEAR DAY staff. W-7 indicated that, in all his years of heavy alcohol abuse, many times during which he would "black-out" from drinking so much, he never once urinated himself. CLEAR DAY

discharged W-7 without explanation and gave him the keys to his vehicle which had been parked outside. W-7 proceeded to wreck the vehicle a short distance away but was able to drive back to the clinic.

31.    A family member showed up and made a cell phone video recording of W-7 in his physical and mental state which was provided to agents. The video shows W-7 attempting to walk a straight line which he consistently fails to do. W-7 is barely able to keep his eyes open and his speech is slurred. W-7 also provided agents with an audio recording from a voice message that he left on his family member's phone immediately following the accident. This recording also demonstrates slurred, almost incoherent speech by W-7 who further stated that he does not remember leaving the message. W-7 was hospitalized for multiple days at Forbes Regional Hospital thereafter because of the levels of medication in his system.

32.    Agents interviewed Witness 8 ("W-8") in March 2021. W-8 self-admitted to CLEAR DAY for alcohol detox at the recommendation of a friend. W-8 was there for approximately three days before she was told that she was being discharged for failing to comply with Activities of Daily Living requirements which she stated was never the case. That morning at around 6:00am, prior to being told that she was being discharged, W-8 was given a dose of Ativan, a benzodiazepine Schedule IV controlled substance, and could not recall anything from that point forward.

33.    That afternoon W-8's friend showed up to the clinic after not hearing from her to find her slumped over in a chair, drooling. The friend called an ambulance which took W-6 to the hospital. During the ride, when ambulance personnel asked W-6 what year it was, she allegedly said "1852." W-6 was treated at Excela Health Westmoreland Hospital and, 12 hours after being given the Ativan dose, still showed "critical" levels of the drug in her system. Emergency room

records from Excela Health Westmoreland Hospital, which W-6 voluntarily gave to agents, state "Overuse of benzodiazepine possible."

34.    In May 2021, agents interviewed W-8's friend, Witness-9 ("W-9") regarding the incident. W-9 provided she became aware of W-8 self-admitting to CLEAR DAY and that W-8 was slated for an early discharge shortly thereafter. W-9 went to check on W-8 at CLEAR DAY after hearing that and found her to be "drooling and incoherent" in a wheelchair inside. An unidentified CLEAR DAY employee advised that W-8 was being discharged for not showering. When asked by W-9 why nobody at CLEAR DAY called an ambulance for W-8 given her physical state, the employee responded, "Are you going to do the paperwork?" With W-9's assistance, W-8 was ultimately transferred from CLEAR DAY to Excela Health Westmoreland Hospital where an attending physician, upon their assessment of W-8, allegedly told W-9, "Thank God you brought her here. She would have died."

35.    A review and analysis of prescription data and Medicaid claims data reveal that Medicaid is paying CLEAR DAY for inpatient treatment for patients with diagnosis codes related to Opioid Abuse for medication assisted treatment; however, the prescription data is inconsistent and does not support those facts.

36.    The Pennsylvania Department of Health ("PA-DOH"), as a regulatory and licensing authority, conducts site inspections of number of different health care facilities. Through these inspections, the PA-DOH produces "surveys" which essentially include the observations made during the inspections and any corrective actions that are recommended and/or taken. These surveys are made available to the public on the PA-DOH website. CLEAR DAY, which is categorized as a Drug and Alcohol ("D/A") facility, has approximately 11 associated surveys related to their detox and/or inpatient rehab clinics dated between August 2018 and April 2021 on

the PA-DOH website. Notable instances listed below occurred at various times and frequencies between those dates. According to the survey, the initial site visit was conducted on June 20, 2018.

37.    From a personnel standpoint, the PA-DOH identified insufficient staffing levels in both CLEAR DAY's detox and rehab clinics, observed inadequate education qualifications for counselors and provided insufficient levels of annual training for staff.

38.    From a clinical perspective, the clinical staff insufficiently enforced the clinic's drug enforcement policy, did not obtain urinalyses, did not properly document individualized treatment plans and complete records, including discharges, failed to document explanation of the risks of treatment to pregnant patients, did not properly document evidence of a one-year history of addiction use during medical evaluations prior to the administration of buprenorphine, failed to enforce their policy regarding the misuse of drugs, presenting the opportunity for patients to divert their medication to sell or trade to other patient, and did not adequately document consultations between the narcotic treating physician(s) who determined initial dosages and the narcotic treating physician(s) performing the physical examinations as otherwise required in those situations.

39.    Administratively speaking, the PA-DOH identified that CLEAR DAY failed to properly obtain identification and age of patients during intake, did not obtain informed and voluntary consent from patients, which included the name, agency, or organization to whom the disclosure would have otherwise been made, did not provide sufficient dietary options or address food grievances, did not properly monitor the progress of existing corrective action procedures and, on numerous occasions, did not properly report the existence of "unusual incidents" which include responses by fire, emergency medical services (EMS) or police.

40.    In August 2021, agents obtained Medical Assistance ("Medicaid") claims data from the Pennsylvania Department of Human Services. A review of the data suggests that, from

approximately September 20, 2018 through June 22, 2021, approximately 15 Medicaid recipients, whose addresses match those of the known three-quarter homes associated with NJAGU, had detox and/or inpatient rehab services billed by CLEAR DAY to either Medicaid or Medicaid Managed Care Organizations. Approximately 483 claim items associated with those recipients were billed in that period in the amount of $212,827.99 with about $178,139.70 of that paid out by those health insurance plans.

41.     In March 2021, agents obtained and reviewed NJAGU's financial records from PNC Bank that show check payments from CLEAR DAY. Many of the checks, drawn on CLEAR DAY's S&T Bank account ending in x6199, are made payable to "Recovery Homes Management" and appear to be endorsed by NJAGU. They are deposited into "Recovery Homes Management, LLC" checking account ending in x7544. From January 2020 to August 2020, approximately seven checks, most of which reference "reimbursement" or various months, were deposited into x7544 in a total approximate amount of $23,731.55.

42.     An online search of the Pennsylvania Department of State's corporate registry database for Recovery Homes Management yielded an associated address of 1914 Brownsville Road, Pittsburgh, PA 15210, which is known to be affiliated with Myles MAZZANTI and Anthony LUPINACCI, who are both owners of the SKYLINE RECOVERY home properties according to public records. As of September 8, 2021, SKYLINE RECOVERY's website lists MAZZANTI, LUPINACCI and NJAGU as President, Project Manager, and Facility Manager, respectively.

43.     Between September 2020 and December 2020, FBI surveillance teams observed NJAGU traveling between SKYLINE RECOVERY and CLEAR DAY on multiple occasions with individuals in his vehicle. These individuals exited NJAGU's vehicle at CLEAR DAY with belongings in hand and entered the clinic. There were also occasions during which NJAGU made

unaccompanied trips to CLEAR DAY for brief periods.

## ELEMENTS OF THE OFFENSES

44.     A person is subject to prosecution under 18 U.S.C. § 1347 if they knowingly execute, or attempt to execute a scheme or artifice:

a.  To defraud any health care benefit program; or

b.  To obtain, by any means of false pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program.

Additionally, a provider is subject to prosecution under 18 U.S.C. § 1035(a)(1) if he or she makes materially false statements in order to receive compensation from any health care program. The elements of false statements related to health care matters are as follows:

a.  The defendant knowingly and willingly;

b.  falsifies, conceals, or covers up; or makes any materially false, fraudulent statements or representations; or

c.  in connection with the delivery of or payment for health care benefits or services.

A person is subject to prosecution under 42 U.S.C. §§ 1320a-7b(b)(1)(A) and (B) if they, in pertinent part:

a.  knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly, or covertly, in cash or in kind –

b.  in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program.

A person violates 21 U.S.C. § 841 if they knowingly and willingly, in pertinent part, dispense

a controlled substance, i.e., prescription medication, outside the usual course of professional practice without a legitimate medical purpose.

## Distribution of Controlled Substances

21 C.F.R. § 1306.03(a) states that, a prescription for a controlled substance may be issued only by an individual practitioner who is: (1) authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession.

21 C.F.R. § 1306.04(a) states that, a prescription for a controlled substance to be effective, must be issued by an individual practitioner acting in the usual course of professional practice. The responsibility for the proper prescribing and dispensing of Schedule III or IV controlled substances is upon the prescribing practitioner.  A prescription issued outside the usual course of professional treatment is not a valid prescription within the meaning and intent of the Controlled Substances Act (21 USC §829).  The person knowingly issuing such a prescription (in this case a medical practitioner), shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

45.    Prescriptions can be in either paper or electronic form.  21 C.F.R. § 1306.05(a) states that all prescriptions for a controlled substance must be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner.

46.    Registered individual practitioners are required to keep records.  21 C.F.R. §1304.03(c) states that: …a registered individual practitioner is not required to keep records of controlled substances in Schedules II, III, IV and V that are prescribed in the lawful course of professional practice, unless such substances are prescribed in the course of maintenance or

detoxification treatment of an individual.

47.    I am aware that the Commonwealth of Pennsylvania requires certain records to be kept with respect to a physician's prescribing, administering and dispensing of controlled substances, as well as maintaining records reflecting patient care.  In this regard, Pennsylvania law requires the following:

Title 49, Pennsylvania Code, Section 16.92, Prescribing, administering, and dispensing controlled substances.

(b) When prescribing administering or dispensing drugs regulated under this section, a person licensed to practice medicine and surgery in this Commonwealth or otherwise licensed or regulated by the Board shall carry out, or cause to be carried out, the following minimum standards:

1)    Initial medical history and physical examination:  An initial medical history shall be taken, and an initial physical examination shall be conducted unless emergency circumstances justify otherwise.  Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding 30 days.  The physical examination shall include an evaluation of the heart, lungs, blood pressure, and body functions that relate to the patient's specific complaint.

2)    Reevaluations.  Reevaluations of the patient's condition and drug efficacy of the drug therapy shall be made consistent with the condition diagnosed, the drug or drugs involved, expected results and possible side effects.

3)    Patient Counseling.  The patient shall be counseled regarding the condition diagnosed and the drug prescribed, administered or dispensed.  Unless the patient is in an inpatient care setting, the patient shall be specifically counseled about dosage levels, instructions for use,

frequency and duration of use and possible side effects.

    4)    Medical Records.  Accurate and complete medical records must document the evaluation and care received by patients.

    i)  On the initial occasion when a drug is prescribed, administered or dispensed to a patient, the medical record must include the following:

        (A)        specification of the symptoms observed by the licensed health care provider and reported by the patient.

        (B)        The diagnosis of the condition for which the drug is being given.

        (C)        The directions given to the patient for the use of the drug.

        (D)        The name, strength and quantity of the drug and the date on which the drug was prescribed, administered or dispensed.

    ii)  After the initial occasion when a drug is prescribed, administered or dispensed, the medical record must include the information required in subsection (b)(4)(i)(D) and changes or additions to the information recorded under subsection (b)(4)(i)(A)—(C)

…

(8)  Adherence to standards of practice.

Compliance with this section will not be treated as compliance with the standards of acceptable and prevailing medical practice when medical circumstances required that the licensed health care provider exceed the requirements of this section.

Title 49, PA Code, Section 16.95 provides:  Medical Records.

(a) A physician shall maintain medical records for patients which accurately, legibly, and completely reflect the evaluation and treatment of the patient.  The components of the records are not required to be maintained at a single location.  Entries in the medical

record shall be made in a timely manner.

(b) The medical record shall contain information sufficient to clearly identify the patient, the person making the entry if the person is not the physician – such as a physician assistant or a certified registered nurse practitioner - the date of the medical record entry and patient complaints and symptoms.

(c) Clinical information pertaining to the patient which has been accumulated by the physician, either by himself or through his agents, shall be incorporated in the patient's medical record.

(d) The medical record shall also include diagnosis, the findings and results of pathologic or clinical laboratory examination, radiology examination, medical and surgical treatment and other diagnostic, corrective or therapeutic procedures.

Pennsylvania Act 191 of 2014: This act is intended to increase the quality of patient care by giving prescribers and dispensers access to a patient's prescription medication history through an electronic system that will alert medical professionals to potential dangers for purposes of making treatment determination. Additionally, the act seeks to aid regulatory and law enforcement agencies in the detection and prevention of fraud, drug abuse and the criminal diversion of controlled substances.

## PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF THE CRIMES DESCRIBED WILL BE FOUND AT THE SEARCH LOCATION

48.     Both W-1 and W-2 stated that CLEAR DAY's former EMR provider was SAMMS, a program owned by Netrix, LLC. On August 27, 2021, a federal grand jury subpoena was served on Netrix, LLC for CLEAR DAY's account information. On October 11, 2021, Netrix, LLC provided documents that show that they provided "SAMMS Support" services to "CLEARDAY

TREATMENT CENTER OF WESTMORELAND" which appears to have been contracted in or about May or June of 2018. The account was closed in or about March 2021. The address of CLEAR DAY's account with Netrix, LLC was 1225 S. Main Street; Greensburg, PA 15601. Agents know this to be an address associated with the business office of Richard HOFFMAN.

49.     Agents reviewed records provided by Netrix, LLC which showed numerous email communications between the company and Destiny MYERS of IT Med Rx. In an email on March 6, 2018, MYERS asserts to a representative of Netrix, LLC "We plan to use are (sic) own servers…" An additional email on September 25, 2018 from Ted DEVLIN identifies a server with an IP address of 192.168.1.5 and username of "clearday\vendor-samms."

50.     In November 2021, employment information was obtained from the Pennsylvania Department of Labor and Industry ("PA-DOL") for "KB", who had been described as HOFFMAN's secretary by W-1. Those records indicate that KB has been simultaneously employed by both CLEAR DAY and "L&E Development Company" since 2018. Agents know L&E Development Company to be owned by Lisa HOFFMAN, wife of Richard HOFFMAN. The address for L&E Development company, according to PA-DOL, is 1225 S. Main Street; Suite 104; Greensburg, PA 15601. As previously stated, this is an address known by agents to be associated with HOFFMAN.

51.     On December 16, 2021, agents conducted a site survey of the SEARCH LOCATION. It was observed that HOFFMAN ENTERPRISES currently occupies Suite 103, and that "Dr. Geoff Medical Weight Loss" occupies Suite 104. A review of the "Dr. Geoff Medical Weight Loss" website revealed that the business relocated to Suite 104 as of December 7, 2021.

52.     I submit that all patient files related CLEAR DAY records, billings, or other documents (collectively, "records") are evidence of the crimes outlined above. Records stored at

the SEARCH LOCATION are relevant to determine whether CLEAR DAY is improperly admitting patients for treatment and, thus, illegally prescribing controlled substances (collectively, "treatment") thereafter in that the Government will be able to see whether the medical information contained therein is consistent with treatment that is within the usual course of professional practice and for legitimate medical needs. On the other hand, if some files reflect that treatment was medically necessary, these files may be evidence that CLEAR DAY was aware of when such treatment was medically necessary and within the scope of usual professional practice, how to document such, and thus, help establish that the illegal admissions and treatment were not by mistake or ignorance. Finally, if records reflect false diagnosis, as with any of the files of the witnesses who were interviewed, said files may be evidence of CLEAR DAY's fraudulent billing for unnecessary treatment.

53.     Based upon my training and experience, participation in health care fraud and other investigations, and my conversations with other experienced law enforcement officers with whom I have been associated, I know that persons involved in the health care industry maintain a large amount of information on computers. Those operating in the health care industry largely utilize EMR systems that provide detailed information such as what services patients received, names of treating providers, billing and payment records, location of treatment and other relevant information. Although SAMMS was CLEAR DAY's EMR software from about June 2018 until March 2021, healthcare providers are often capable of integrating data from prior records when they switch EMR companies. CLEAR DAY has been in operation since about August 2018.

54.     I submit that there is probable cause to believe that these records will be found at the SEARCH LOCATION based upon the subpoena return and conversations with NETRIX, LLC confirming that CLEAR DAY's records in SAMMS existed on a server "on premise." I submit

that this information is not stale in that CLEAR DAY is legally required to keep documentation related to Medicare and Medicaid billing for a period of at least seven years.

55.    I believe it is reasonable to conclude, based upon a review of all the facts gathered throughout this investigation, that practitioners of CLEAR DAY were potentially prescribing illicit prescriptions for scheduled drugs. I believe a review of the patient file records, which are sought pursuant to this search warrant, will contain evidence of CLEAR DAY's illicit prescribing and dispensing of pharmaceutical drugs not for a legitimate medical purpose and outside the usual course of professional practice.

## <u>KNOWLEDGE BASED UPON TRAINING AND EXPERIENCE</u>

56.    Based upon my training and experience, my participation in health care fraud and other investigations, and my conversations with other experienced law enforcement agents and officers with whom I have been associated, I know that:

a)  Persons and entities involved in the health care industry maintain a large amount of information on computers.  These health industries utilize an electronic medical records system that provides detailed information such as what services the patients received, treating physician, billing, payment, location of treatment, and other relevant information;

b)  The majority of Medicare, Medicaid, and general insurance claims are submitted electronically via computers;

c)  Medicare, Medicaid, and private health insurance companies maintain large web-based sites which provide education materials and claim submission assistance to medical providers;

d)  Many companies conduct business transactions such as banking, product ordering,

travel, and other activities via computers;

e)   Electronic medical records, diagnostic readings, and prescriptions are becoming increasingly popular with health care professionals;

f)   Persons involved in criminal activities, often conceal information in their computers;

g)   Persons involved in the criminal activities, amass proceeds from the criminal activities to otherwise conceal them from discovery by law enforcement officers. To accomplish these goals, individuals engaged in criminal activities often use the services of banks and financial institutions, including but not limited to, bank accounts and their attendant check writing privileges and the purchase of securities, cashier's checks, money drafts, and letters of credit.  These individuals often purchase real estate or deposit proceeds in bank accounts in another individual's or entity's name, to conceal the true ownership and illegal source of the proceeds. Records and documents related to these transactions are often maintained where these individuals have easy and ready access to them, including in their residences and businesses, which are often kept as computer data files in computers or data in cell phones and personal digital assistants;

h)   Persons involved in criminal activities, commonly maintain in their schedules, businesses notes, phone numbers, memorandums, books, papers, office files, and business documents relating to the criminal activity and/or associates involved in the illegal activity, which are often kept as computer data files in computers or data in cell phones and personal digital assistants; and,

i)   Unexplained wealth is probative of crimes motivated by greed, including the

criminal activity.  Persons involved in criminal activity usually maintain documents related to wealth in their businesses, which are and often kept as computer data files in computers or data in cell phones and personal digital assistants.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

57.    As described above and in Attachment A, this application seeks permission to search for records that might be found within SEARCH LOCATION and within computers and other electronic devices and storage located within SEARCH LOCATION, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B). I submit that, there is probable cause to believe those records will be stored within SEARCH LOCATION, and or within computers and other electronic devices and storage located within SEARCH LOCATION for at least the following reasons:

58.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before

they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

59.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

60.    Based on actual inspection of other evidence related to this investigation, including but not limited to emails, medical records, and patient files, I am aware that computer equipment was used to generate, store, and print documents used in the health care fraud scheme.

61.    As further described in ATTACHMENT B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be stored, located, and/or maintained within computers at SEARCH LOCATION because:

a)  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file);

b)  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active;

c)  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

d)  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.

e)  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

62.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

63.    The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating, the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log computer user account session times and durations, computer

activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. In addition, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.

64. Lastly, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting or encrypting such evidence to conceal it from law enforcement). A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

65. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer

evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

66.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

67.     Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a SEARCH LOCATION for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the SEARCH LOCATION, it is sometimes possible to make an image copy of storage media. Imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true for the following reasons:

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on SEARCH LOCATION could be unreasonable. As explained above, because the warrant calls for forensic electronic

evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b) Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SEARCH LOCATION. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools. HHS-OIG seeks authorization to disseminate copies/images of the digital evidence to other law enforcement agencies as deemed appropriate for the purpose of facilitating the examination and review of the digital evidence.

d) Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to

computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

68.    As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve an investigation on scene of what computers or storage media must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, agents will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of CLEAR DAY so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the CLEAR DAY's legitimate business. If, after inspecting the computers, it is determined that some or all equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

69.    Based upon the foregoing, I believe there is probable cause that CLEAR DAY TREATMENT CENTER, Richard HOFFMAN, Stephen DEVLIN, George JONES, Jon NJAGU and potentially others are engaged in violations of federal crimes, namely, 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1035 (False Statements in Health Care Matters), 42 U.S.C. §§ 1320a-7b(b)(1)(A) and (B) (Anti-Kickback Statute), and 21 U.S.C. § 841 (Unlawful Dispensing of Controlled Substances). Furthermore, there is probable cause to believe that evidence of those violations, as described in Attachment B, will be found at 1225 S. Main Street; Suite 103; Greensburg, PA 15601, as described in Attachment A.

70.    On September 4, 2020, March 22, 2021, and September 17, 2021 the Government applied for, and received, orders authorizing law enforcement to obtain substance abuse records by search warrants and by grand jury subpoenas, and authorizing law enforcement to use

undercover agents and confidential informants to investigate the employees of CLEAR DAY. The September 17, 2021 Order was a renewal of the March 22, 2021 Order permitting an extension of said activities and was granted at Magistrate No. 21-1886 by the Honorable Patricia L. Dodge. It will expire on or about March 17, 2022.

## REQUEST FOR SEALING

71.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations, as not all the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the ongoing criminal investigation and may severely jeopardize its effectiveness.

72.    I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge, information, and belief.

*/s/ Andrew L. Bovaird*
Andrew L. Bovaird
Special Agent
U.S. Dept. of Health and Human Services
Office of Inspector General

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 7th day of January, 2022.

_____
HONORABLE PATRICIA L. DODGE
United States Magistrate Judge

## ATTACHMENT A

### *Property to Be Searched*

The location of 1225 S. Main Street; Greensburg, PA 15601 is a large, white, four-story office building. Atop the structure are the words "Wellington Square" in black letters. A common entrance with the words "1225 S. Main Street" above the doorway leads to a common area.

The SEARCH LOCATION of Suite 103 can be found by walking straight through the common area from the entrance, turning left where the corridor splits, proceeding to the end of the hallway, and then turning right. Suite 103 is the last door on the left at the end of the hallway. A brown metal sign displaying "HOFFMAN ENTERPRISES" in white letters is affixed to the interior wooden door leading to Suite 103.



# ATTACHMENT B

## *Items to be Seized*

The documents, electronic data and items listed below for the period June 1, 2018 to the present, all of which constitute evidence, fruits and/or instrumentalities of violations of 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1035 (False Statements in Health Care Matters), 42 U.S.C. §§ 1320a-7b(b)(1)(A) and (B) (Anti-Kickback Statute), and 21 U.S.C. § 841 (Unlawful Dispensing of Controlled Substances).

1.      Any and all employment and/or human resource records, including but not limited to applications, training, financial, certifications, resumes, licensing and certification information, insurance verification, and background investigations for any Clear Day Treatment Center ("Clear Day") employee, contractor or owners;

2.      Any and all internal memoranda, communications (including emails and texts), or documentation, digital, web-based or hard copy, regarding billing for, or related to/by Clear Day employees, contractors or owners;

3.      All documents, contracts, records, receipts, billing manuals, coding manuals, correspondence related to Medicare, Medicaid, and any other state or federal government-funded health benefit plan, or any private health care benefit plan;

4.      Any and all payroll documentation for Clear Day employees, contractors or owners to include but not limited to memorandum and records regarding incentive fees, bonus payments, or payments based upon volume, physical checks, electronic pay cards, pay stubs, Forms W-2, W-4, 1040, 1099, cash payments and bonuses, and any associated records;

5.      Any travel records associated with Clear Day employees, contractors or owners, to include itineraries, reservations, receipts, reimbursement forms, and means and method of payment;

6.      Any scheduling records of Clear Day employees, contractors or owners to include daily schedules, travel schedules (both official business and personal), meetings, conferences, calendars, and/or notes, in digital, SAMMS portal access, or physical format;

7.      Patient scheduling, patient notes, and billing records of Clear Day in any format to include, digital, SAMMS portal access, or physical format;

8.      Bank documents, including bank account statements, cancelled checks, check registers, check stubs, deposit tickets, savings passbooks, loan agreements/contracts, mortgage applications and related documents, letters of credit, bank drafts, money orders, cashier's checks, wire transfers, debit advice, letter instructions regarding transfers of funds, bank notices, credit memos,

certificates of deposit, trust accounts, safe deposit boxes and keys, petty cash ledger(s), and any other records relating to the Clear Day employees, contractors or owners who have signature or purchase authority;

9.      Computers located in Clear Day locations, and the files contained therein, which include the computer password and/or logins to capture any encrypted data.

10.     Any and all correspondence or communications, in any format, between Clear Day employees or owners relating to scheduling, billing, travel, reimbursements, and/or profitability reports;

11.     Any publication, document, manuscript drafted by Clear Day employees, contractors or owners showing their knowledge and expertise in the field of addiction treatment;

12.     All correspondence, record, files, charts, clinical notes, counseling records, peer reviews, event reports, and/or insurance billing that in any way relates to the patients of Clear Day;

13.     Contracts and any other associated records pertaining to outside entities with whom Clear Day does business, to include drug testing laboratories and pharmacies.

14.     Unusual incident reports completed by Clear Day staff

15.     Transportation logs completed by Clear Day staff

16.     Documentation related to patient referrals, to include names, sources, and revenue tracking related to those referrals

17.     Medication disposal records

18.     Loose, unattributable controlled substances

All of the foregoing items of evidence above are subject to seizure pursuant to this warrant in whatever form, and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The agents may attempt to create an electronic "image" of those parts of any computers or

electronic storage media that are likely to store the things described above in this warrant; that is, to take a complete electronic picture of the computer's data, including all hidden sectors and deleted files. The agents or qualified computer experts will then conduct an offsite search for the things described in the warrant from the "mirror image" copy later. If the agents successfully image the computers, the agents will not conduct any additional search or seizure of the computers at the SEARCH LOCATION.

If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system or electronic storage media that the agents believe must be seized to permit the agents to locate the things described in this warrant at an offsite location. The seized components will be removed from the SEARCH LOCATION being searched. If, after inspecting the computers, it is determined that some or all this equipment is no longer necessary to retrieve and preserve the evidence, the government will return them within a reasonable time.

For any of the computers, computer hard drives, or other physical objects upon which computer data can be recorded that is called for by this warrant, or that might contain things otherwise called for by this warrant, law enforcement may seize:

1. Evidence of who used, owned, or controlled the computers, computer hard drives, or other physical objects at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. Evidence of software that would allow others to control the computers, computer hard drives, or other physical objects, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. Evidence of the lack of such malicious software;

4. Evidence of the attachment to the computers, computer hard drives, or other physical objects of other storage devices or similar containers for electronic evidence;

5. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computers, computer hard drives, or other physical objects;

6. Evidence of the times the computers, computer hard drives, or other physical objects were used;

7. Passwords, encryption keys, and other access devices that may be necessary to

access the computers, computer hard drives, or other physical objects;

8.  Documentation and manuals that may be necessary to access or to conduct a forensic examination of the computers, computer hard drives, or other physical objects;

9.  Contextual information necessary to understand the evidence described in this attachment; and,

10. Hot spots, or wireless "access" points, that provide network or internet connectivity to mobile devices like computers, phones, tablets, or any other wireless capable device.  The hot spot accesses a 3G/4G cellular network and shares its data connection wirelessly with devices within its broadcast range.